UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:14CV-00023-JHM

**OWENSBORO HEALTH, INC.**                                                                 **PLAINTIFF**

**V.**

**SYLVIA M. BURWELL,**
**SECRERTARY OF HEALTH AND HUMAN SERVICES                DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on cross-motions for summary judgment by the parties [DN 13, DN 16]. This action concerns the amount of Medicare reimbursement the Plaintiff, Owensboro Health, Inc., should receive for serving a disproportionate share of low-income patients. Owensboro Health brings this action pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, seeking judicial review of a final Medicare reimbursement decision by the Secretary of the Department of Health and Human Services ("HHS" or "the Secretary"). The Secretary determined that Owensboro Health was not permitted to include in the calculation of its Medicare Disproportionate Share Hospital ("DSH") adjustment patient days for patients covered by the Kentucky Hospital Care Program ("KHCP") for the years 2003 to 2005. Fully briefed, this matter is ripe for decision.

**I. BACKGROUND**

Medicare, Title XVIII of the Social Security Act, is a federally funded health insurance program for the elderly and disabled. 42 U.S.C. §§ 1395—1395cc. Medicaid, Title XIX of the Social Security Act, "is a federal grant program—unavailable to Medicare recipients—that requires each state to create federal-state partnerships to provide certain medical services to individuals 'whose income and resources are insufficient to meet the costs of necessary medical

services.'" Jackson Purchase Medical Center v. United States Dept. of Health and Human Services, 2015 WL 4875112, *1 (E.D. Ky. Aug. 12, 2015)(quoting 42 U.S.C. § 13961).

### A. Medicare and Medicare DSH

Part A of the Medicare statute provides health insurance for inpatient hospital medical services. 42 U.S.C. §§ 1395c, 1395d. "Under Part A, a participating hospital enters into an agreement with the Secretary whereby the hospital promises to render services to Medicare beneficiaries. § 1395cc. The hospital does not charge the Medicare beneficiaries for the services (except for certain deductible and coinsurance amounts), but instead, the federal government directly reimburses the hospital for the services rendered. § 1395cc(a)(1)." University of Kansas Hospital Authority v. Sebelius, 953 F. Supp. 2d 180, 182 (D.D.C. 2013).

"[A] hospital is not reimbursed at the time of service, but rather, the hospital must file an annual report showing the costs it incurred during the fiscal year and the portion of those costs allocated to Medicare. 42 C.F.R. §§ 413.24, 413.50." University of Kansas Hospital Authority, 953 F. Supp. 2d at 182. "The report is filed with a fiscal intermediary ('FI'), which is typically a private insurance company acting under contract with the Secretary. 42 U.S.C. § 1395ww(d)(5), 42 C.F.R. § 413.20(b). After auditing the hospital's report, the FI determines the amount of reimbursement owed to the hospital by Medicare through the issuance of a Notice of Program Reimbursement ('NPR'). 42 C.F.R. § 405.1803(a)." Id. "If the hospital is dissatisfied with the FI's award, it has 180 days to appeal to the Provider Reimbursement Review Board (the "PRRB"), which issues a decision that the Secretary may reverse, affirm, or modify within sixty days. 42 U.S.C. § 1395oo(f)(1). If the hospital remains dissatisfied after either the PRRB or the Secretary issues a final decision, it may seek judicial review by filing suit in the appropriate federal district court." Id.

Additionally, hospitals are not reimbursed for the actual cost of treating Medicare beneficiaries. Instead, Medicare reimburses hospitals through a prospective payment system ("PPS") based on pre-set rates based on a patient's diagnosis at discharge. 42 U.S.C. § 1395ww(d). However, these predetermined rates may be adjusted for specific hospitals under certain circumstances recognized by Congress. Id. This case involves one such adjustment, known as the Medicare Disproportionate Share Hospital ("DSH") adjustment. 42 U.S.C. §1395ww(d)(5)(F). "Under the Medicare DSH adjustment, the federal government pays more to hospitals that 'serve[ ] a significantly disproportionate number of low-income patients.'" University of Kansas Hosp. Authority, 953 F. Supp. 2d at 183 (quoting Catholic Health Initiatives Iowa Corp. v. Sebelius, 718 F.3d 914, 916 (D.C. Cir. 2013)(quoting 42 U.S.C. §1395ww(d)(5)(F)(i)(I))). "This provision is based on Congress's judgment that low-income Medicare patients have generally poorer health and are costlier to treat than high-income Medicare patients." University of Kansas Hosp. Authority, 953 F. Supp. 2d at 183. "To compensate for this disparity, Congress authorized the Secretary to disburse extra Medicare funds—the Medicare DSH adjustment—to hospitals that treat a disproportionate share of low-income patients." Id.

Whether a hospital qualifies for the Medicare DSH adjustment and the amount of the adjustment are based on the hospital's "disproportionate low-income patient percentage," calculated "as the sum of two fractions, which are referred to as the Medicare and Medicaid fractions." Waterbury Hospital Center v. Sebelius, 2012 WL 4512506, *2 (D. Conn. Sept. 29, 2012)(citing 42 U.S.C §1395ww(d)(5)(F)(v) and (vi)). At issue in the present case is the Medicaid fraction. The Medicaid fraction is a proxy for the percentage of a provider's low-income, non-Medicare patients. The Medicare statute defines the Medicaid Fraction as:

3

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, but who were not entitled to benefits under part A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C §1395ww(d)(5)(F)(vi)(II). "[I]n general, under this formula, a hospital's Medicare DSH adjustment increases as the number of *Medicaid*-eligible patient days in the numerator of hospital's Medicaid Fraction increases." University of Kansas Hosp. Authority, 953 F. Supp. 2d at 184 (citing Cabell Huntington Hosp., Inc. v. Shalala, 101 F.3d 984, 985 (4th Cir. 1996)(noting that the Medicare statute provides a hospital more money for Medicare patients the more Medicaid patients it treats)). Owensboro Health challenges the Secretary's interpretation of the patients that should be credited in the numerator of the Medicaid fraction.

### B. Medicaid and Medicaid DSH

"Medicaid is a state-specific program where, pursuant to a federally approved 'state Medicaid plan,' the federal government provides matching payments for medical assistance to eligible, low-income individuals." Jackson Purchase Medical Center, 2015 WL 4875112, *2. The "state Medicaid plan" specifies the qualifications for eligibility and establishes the nature and scope of the medical care and services covered pursuant to the state plan. 42 C.F.R. § 430.10. "The Secretary must approve the state plan before federal matching payments commence, but '[c]onsiderable deference is provided to states under the [Medicaid] Act to decide 'eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.'" Jackson Purchase Medical Center, 2015 WL 4875112, *2 (quoting Linton by Arnold v. Commissioner of Health & Env't, State of Tenn., 65 F.3d 508, 516 n. 10 (6th Cir. 1995) (quoting 42 C.F.R. § 430.0)); 42 U.S.C. §§ 1396a, 1396d(b).

4

"Like Medicare, Medicaid also allows DSH adjustments." Waterbury Hospital Center, 2012 WL 4512506, *2. The Medicare DSH adjustment is separate and distinct from the Medicaid DSH adjustment. Medicare DSH "utilizes a rigid formula set by the Medicare statute." Jackson Purchase Medical Center, 2015 WL 4875112, *2. In contrast, Medicaid DSH adjustments are defined by each state. "A state is given considerable discretion in determining how to calculate Medicaid DSH adjustments under its plan." Waterbury Hospital Center, 2012 WL 4512506, *2. The Medicaid statute allows a state to base its DSH adjustment on services to "patients eligible for medical assistance under [an approved] State plan . . . *or to low-income patients*." 42 U.S.C. § 1396r–4(c)(3)(B)(emphasis added). "Thus, Congress explicitly allowed a state to define its Medicaid DSH adjustment to include patients not eligible for *any* assistance contemplated under the Social Security Act." Jackson Purchase Medical Center, 2015 WL 4875112, *2.

Despite a state's broad discretion in defining its Medicaid DSH adjustments, every state must include this definition in its state Medicaid plan for approval from the Secretary. 42 U.S.C. § 1396r–4(a). "Congress requires approval of this definition to guarantee that Medicaid DSH payments assist medical facilities providing care to high volumes of low-income patients rather than 'for unrelated purposes, such as building roads, operating correctional facilities, [or] balancing State budgets.'" Jackson Purchase Medical Center, 2015 WL 4875112, *3 (quoting H.R.Rep. No. 103–111, at 212 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 539); University of Washington Med. Ctr. v. Sebelius, 634 F.3d 1029, 1034–35 (9th Cir. 2011). Accordingly, the Secretary's examination of a state's Medicaid DSH definition "is limited to verifying that these payments are directed to low-income medical care and service." Jackson Purchase Medical Center, 2015 WL 4875112, *3 (citing Nazareth Hosp. v. Secretary United States Dept. of Health

and Human Services, 747 F.3d 172, 183 (3d Cir. 2014)). Importantly, "[t]he Secretary does not, however, approve the *details* of a state's plan to *use* Medicaid DSH payments to assist medical facilities providing care to high volumes of low-income patients." Id. Once a state's plan is approved, the Secretary "is authorized to pay the state matching funds for Medicaid expenditures," commonly referred to as Federal Financial Participation ("FFP"). Waterbury Hospital Center, 2012 WL 4512506, *2. "Accordingly, Medicaid programs vary from state to state, both with respect to persons and services covered, and to the scope and duration of benefits." Verdant Health Commission v. Burwell, 2015 WL 5124031, *1 (W.D. Wash. Sept. 1, 2015).

### C. Kentucky's Medicaid Plan

Kentucky has an approved Medicaid plan. The Kentucky Medicaid Plan established the requirements for statewide Medicaid eligibility. For example, during the relevant time period, a family of three could earn no more than thirty-nine percent of the federal poverty level ("FPL") to receive Kentucky Medicaid benefits. (DN 13 at 8-9.) "The state plan also described Kentucky's Medicaid DSH definition. Kentucky's Medicaid DSH definition included 'traditional' Medicaid patients and Kentucky Hospital Care Program ('KHCP') patients." Jackson Purchase Medical Center, 2015 WL 4875112, *3 (citing also 42 U.S.C. § 1396r–4(c)(3)(B) (permitting a state to include "patients eligible for medical assistance under a State plan approved under this subchapter or *[other] low-income patients*" in its Medicaid DSH definition)).

"KHCP is a state program that provides medical assistance to individuals and families that (1) can demonstrate Kentucky residency; (2) earn less than one hundred percent of the FPL; and (3) are ineligible for traditional Medicaid." Jackson Purchase Medical Center, 2015 WL

6

4875112, *3. Eligibility for KHCP is based solely on income and assets. KRS § 205.640(5). KHCP patients are not eligible for Medicare or for Kentucky's Medicaid program. Id. ("Services provided to individuals who are eligible for medical assistance [Medicaid] or the Kentucky Children's Health Insurance Program do not qualify for reimbursement under this section . . . ." KRS § 205.640(5)). "Thus, a family of three earning forty-three percent of the FPL could *not* qualify for Medicaid but could receive medical assistance under KHCP. KHCP is funded through state and local payments, and Kentucky also authorizes Medicaid DSH payments to offset the costs providers incur when treating KHCP patients." Jackson Purchase Medical Center, 2015 WL 4875112, *3. "Kentucky submitted its state Medicaid Plan, including the state Medicaid DSH definition, to the Secretary for approval. The Secretary approved the Kentucky Medicaid Plan." Id. at *4.

### D. Administrative Proceedings

Owensboro Health participates in Medicare and serves KCHP patients. Owensboro Health filed Medicare cost reports for the years at issue. In calculating the Medicare DSH, Owensboro Health's fiscal intermediary ("FI") issued the Notice of Program Reimbursement ("NPR") for the relevant reporting periods without including KHCP patient days in the numerator of the Medicaid fraction. The Plaintiff appealed individually to the PRRB which upheld the FI's findings. Owensboro Health maintains that the loss for the hospital in Medicare DSH adjustments is over $2.7 million dollars. Owensboro Health appealed the Provider Reimbursement Review Board's ("PRRB") decision to the Administrator of the Centers for Medicare & Medicaid Services ("CMS") who issued her final decision on January 15, 2014. (AR 2-21.) The CMS Administrator held that the FI properly did not include the KCHP patient days in the numerator of the Medicaid fraction. Significantly, she concluded that that the

statutory language in the Medicare DSH statute -- "patients who were eligible for medical assistance under a State Plan approved under title XIX" -- means patients who were eligible for Medicaid. Accordingly, because the KHCP program is for individuals not eligible for Medicaid, the Administrator determined that those patient days could not be counted in the numerator of the Medicaid fraction of the Medicare DSH calculation. (AR 15-16.) Additionally, the CMS Administrator found those KHCP days were not transformed into Medicaid patient days under the Medicare DSH calculation by virtue of the fact that they were counted to determine Medicaid DSH payments. (AR 17-18.) The Administrator's decision constituted the final administrative decision of the Secretary.

As a result of this decision, Owensboro Health filed this action asserting violations of the Administrative Procedure Act and the Equal Protection Clause of the Fourteenth Amendment. The parties have filed cross-motions for summary judgment.

## II. STANDARD OF REVIEW

The Supreme Court has established a two-step process for reviewing an agency's interpretation of a statute that it administers. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). "'First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" Clark Regional Medical Ctr. v. United States Dept. of Health and Human Servs., 314 F.3d 241, 244–45 (6th Cir. 2002)(quoting Jewish Hosp., Inc. v. Secretary of Health and Human Servs., 19 F.3d 270, 273 (6th Cir. 1994) (emphasis in original)). The Supreme Court has explained that "[t]he judiciary is the final authority on issues of statutory construction and

must reject administrative constructions which are contrary to clear congressional intent." Clark Regional Medical. Ctr., 314 F.3d at 245 (quoting Chevron, 467 U.S. at 843 n. 9).

Second, if the Court determines that Congress has not directly addressed the precise question at issue, that is, that the statute is silent or ambiguous on the specific issue, the Court must determine "'whether the agency's answer is based on a permissible construction of the statute.'" Clark Regional Medical Ctr., 314 F.3d at 245 (quoting Jewish Hosp., 19 F.3d at 273). "In assessing whether the agency's construction is permissible, [the Court] 'need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [the Court] would have reached if the question initially had arisen in a judicial proceeding." Id. at 245. "In fact, the agency's construction is entitled to deference unless 'arbitrary, capricious, or manifestly contrary to the statute.'" Id. (quoting Chevron, 467 U.S. at 844).

"Pursuant to 42 U.S.C. § 1395oo(f)(1), a decision by the [CMS] is subject to review under the [APA], 5 U.S.C. § 706(2)(A)." Battle Creek Health System v. Leavitt, 498 F.3d 401, 409 (6th Cir. 2007)(quoting Clark Regional Med. Ctr., 314 F.3d at 245). Under the APA, the Court reviews an agency decision to see whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." Id. (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). "Under the APA, an agency's interpretation of a regulation must be given controlling weight unless it is 'plainly erroneous or inconsistent with the regulation.'" Id.

### III. DISCUSSION

Owensboro Health maintains that the Secretary disregarded the express language of the Medicare DSH statute which mandates inclusion of patient days for all patients eligible under a state plan approved under Title XIX, not just those eligible directly for Medicaid. Further,

9

Owensboro Health argues that the Administrator's exclusion of KHCP patients in the present case violates the Equal Protection Clause because the Secretary includes patients "who could not be eligible for medical assistance under Title XIX standards but have been provided medical assistance only because they are part of an expansion population approved under Title XIX as part of a § 1115 waiver.

### A. Review of Secretary's Interpretation of Medicare DSH Statutory Language

The question before the Court is whether KHCP patients are "eligible for medical assistance under a State plan approved under subchapter XIX."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  Thus, it is necessary to determine the meaning of this statutory language. The majority of Courts, including the Third, Ninth, and District of Columbia Circuits, that have interpreted this provision have held that the phrase "eligible for medical assistance under a State plan approved under subchapter XIX" means eligible for Medicaid.  University of Kansas Hosp. Authority, 953 F. Supp. 2d at 190 (citing Adena Regional Medical Center v. Leavitt, 527 F.3d 176, 180 (D.C. Cir. 2008)(holding under Chevron step one that State-only plan beneficiaries are not Medicaid-eligible and, thus, the Secretary properly excluded days associated with those patients from the Medicaid Fraction)); Univ. of Wash. Med. Ctr. v. Sebelius, 634 F.3d 1029, 1034–36 (9th Cir. 2011)(concluded that "'eligible for medical assistance under a State plan approved under subchapter XIX' is unambiguously limited to those eligible for traditional Medicaid"); Verdant, 2015 WL 5124031, *6; Banner Health v. Sebelius, 715 F.Supp.2d 142, 162 (D.D.C. 2010).[1]  In the present case, it is undisputed that KHCP patients

---

[1] Plaintiff relies on Jewish Hosp., Inc. v. Secretary of Health and Human Services, 19 F.3d 270 (6th Cir. 1994), in support of its argument that the Third, Ninth, and District of Columbia Circuits are incorrect.  However, as noted by the Sixth Circuit in Metropolitan Hosp. v. U.S. Dept. of Health and Human Services, 712 F.3d 248 (6th Cir. 2013), the holding of Jewish is limited to its decision that "'all days for which an individual is capable of receiving Medicaid should be figured into the proxy calculation,' rather than only the days of care for which Medicaid actually paid." Id. at 257 (quoting Jewish Hosp., 19 F.3d at 274).  Jewish Hosp. is not inconsistent with the above cited case law.

are not eligible for traditional Medicaid. (Memorandum in Support of Plaintiff's Motion for Summary Judgment at 9.) Consistent with the above case law, because KHCP patients "are not eligible for Medicaid, the days associated with their treatment cannot be included in a provider's Medicaid Fraction." University of Kansas Hosp. Authority, 953 F. Supp. 2d at 190.[2]

While recognizing that KHCP patients are not eligible for traditional Medicaid, Owensboro Health maintains that KHCP is a Kentucky Medicaid approved plan warranting the inclusion of KHCP patient days in the Medicaid fraction of the Medicare DSH Adjustment. Owensboro Health asserts that in approving the Kentucky Medicaid Plan, the Secretary also approved the KHCP program; therefore, the KHCP Program qualifies as "a State plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The Court disagrees. Owensboro Health "conflate[s] approval of a *definition* with approval of a *plan*." Jackson Purchase Medical Center, 2015 WL 4875112, *6. As noted above, the Secretary's examination of a state's Medicaid DSH definition "is limited to verifying that these payments are directed to low-income medical care and service." Jackson Purchase Medical Center, 2015 WL 4875112, *3 (citing Nazareth Hosp. v. Secretary United States Dep't of Health & Human Servs., 747 F.3d 172, 183 (3d Cir. 2014)). Importantly, "[t]he Secretary does not, however, approve the *details* of a state's plan to *use* Medicaid DSH payments to assist medical facilities providing care to high volumes of low-income patients." Id.

In the present case, KHCP is a Kentucky program for low-income individuals distinct from Medicaid. Jackson Purchase Medical Center, 2015 WL 4875112, *6. Kentucky "included

---

[2] The Court in Jackson Purchase Medical Center v. United States Dept. of Health and Human Services, 2015 WL 4875112, *1 (E.D. Ky. Aug. 12, 2015) reached the same conclusion for essentially the same reasons, with one exception. There, the Court also held that "[b]ecause Medicaid DSH payments are distributed prospectively and not directed towards specific care or services, Medicaid DSH funds do not constitute 'medical assistance.'" Id. at *6. This Court does not share in that view and believes instead that the pivotal question in these cases is whether the medical assistance in question was provided *under a State plan approved under subchapter XIX.*

11

this program in its definition of the Medicaid DSH adjustment, and the Secretary approved the *definition* of Kentucky's Medicaid DSH adjustment. The Secretary did not approve the qualifications, nature, or scope of the KHCP program." Id. (citing H.R.Rep. No. 103111, at 212 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 539). Thus, contrary to the argument of the Plaintiff, "the Secretary did not approve the KHCP *plan* under subchapter XIX, and KHCP patients may not be credited in the numerator of the 'Medicaid fraction' of the Medicare DSH formula." Jackson Purchase Medical Center, 2015 WL 4875112, * 7; see also Adena Regional Med. Ctr., 527 F.3d at 178–79 (rejecting the argument that the Secretary's approval of the definition of a state's Medicaid DSH adjustments equated to approval of the plan); Univ. of Wash. Med. Ctr., 634 F.3d at 1034–35 (same).

Therefore, the Court concludes that the Secretary was correct in finding that KHCP patients were not eligible for medical assistance under Kentucky's Medicaid plan, and thus their patient days were properly excluded from Owensboro Health's Medicare DSH adjustment.

### B. Equal Protection

Owensboro Health argues that the Secretary's exclusion of KHCP patients in the present case violates the Equal Protection Clause of the Fourteenth Amendment because the Secretary includes patients in the Medicare DSH adjustment who are not eligible for medical assistance under Title XIX standards but have been provided medical assistance only because they are part of an expansion population approved under Title XIX as part of a § 1115 waiver. Owensboro Health maintains that KHCP patients are functionally identical to §1115 waiver patients. Review of an equal protection claim in the context of agency action is similar to that under the APA. "That is, an agency's decision must be upheld if under the Equal Protection Clause, it can show a

'rational basis' for its decision." Nazareth Hosp., 747 F.3d at 180 (citing F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313 (1993)).

Section 1115 of the Social Security Act authorizes the Secretary "to waive statutory requirements pertaining to federal entitlement programs such as Medicaid and 'regard' patients as eligible for Medicaid if they are treated under an experimental, pilot or demonstration project under 42 U.S.C. § 1315." Nazareth Hosp., 747 F.3d at 175 (citing 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)); see also Verdant, 2015 WL 5124031, *2. The "costs of such projects . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State [Medicaid] plan." 42 U.S.C. § 1315(a)(2). To authorize such a demonstration project, known as a Section 1115 waiver project, "the Secretary must conclude that the state-submitted proposal 'is likely to assist in promoting the objectives of'" Medicaid. Nazareth Hosp., 747 F.3d at 176 (citing 42 U.S.C. § 1315(a)). "In addition, the Secretary has discretion to choose which Medicaid requirements will be waived, how long the waiver lasts, and whether the costs of the project will be considered Medicaid-covered expenditures." Id. at §§ 1315(a)(1)-(a)(2). "Waivers are not inherently provided for in State Plans; rather, states must submit specific applications for Section 1115 waiver projects." Id.

The Court finds that there is a rational basis upon which to distinguish patient days covered under KHCP from patient days covered under a Section 1115 waiver project. First, statutory authority exists to treat KHCP patient days and Section 1115 patient days differently from each other. As explained by the Third Circuit in Nazareth Hosp. v. Secretary U.S. Dept. of Health and Human Services, "[t]he statutory subsection, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), mandates that Medicare DSH adjustments are keyed to the number of Medicaid-eligible patient days, adding that the Secretary may also choose to include days for patients eligible under a

13

Section 1115 project." Nazareth Hosp., 747 F.3d at 180. In contrast, as discussed in detail above, the statute requires the Secretary to exclude KHCP patient days from Medicare DSH calculations because those patients are not eligible for Medicaid. See also Adena Regional Medical Center, 527 F.3d at 179-80; University of Washington Medical Center, 634 F.3d at 1034; Phoenix Memorial Hosp. v. Sebelius, 622 F.3d 1219, 1227 (9th Cir. 2010).

Second, the distinction between section 1115 waiver programs and KHCP is rational because the programs have different purposes and the federal government has control over only Section 1115 projects. Nazareth Hosp., 747 F.3d at 181; Verdant, 2015 WL 5124031, *9. As explained above, "a section 1115 waiver project is an experimental, demonstration or pilot project which is only approved if the Secretary concludes that it 'is likely to assist in promoting the objectives of' Medicaid." Id. (quoting 42 U.S.C. § 1315(a)). In contrast, the KHCP plan requires no federal assessment that it is likely to assist in promoting the goals of Medicaid. Additionally, while the Secretary has significant control over Section 1115 waivers, see 42 U.S.C. §§ 1315(a)(1)- (a)(2), "the Secretary's scrutiny of a state's Medicaid DSH *definition* is limited to verifying that these payments are directed to low-income medical care and service." Jackson Purchase Medical Center, 2015 WL 4875112, *3 (citing Nazareth Hosp., 747 F.3d at 183). "The Secretary did not approve the qualifications, nature, or scope of the KHCP program." Jackson Purchase Medical Center, 2015 WL 4875112, *6.

Accordingly, the Court finds that the Secretary's interpretation of the Medicare DSH statute to include § 1115 waiver days in the Medicare DSH calculation, but not to include KHCP days, is not arbitrary and capricious and does not violate Owensboro Health's rights under the Equal Protection Clause of the Fourteenth Amendment.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion for summary judgment by Plaintiff, Owensboro Health, Inc., [DN 13] is **DENIED** and the motion for summary judgment by Defendant, Sylvia M. Burwell, Secretary of Health and Human Services, [DN 16] is **GRANTED**. A Judgment shall be entered consistent with this Opinion.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

cc: counsel of record

September 15, 2015